# EXHIBIT B

**EXHIBIT B**

## VOLUNTARY ARBITRATION PROCEEDINGS

| | |
|---|---|
| In the Matter of the Arbitration | ( Opinion and Award |
| | ( |
| Between | ( Grievance No.:    2008-81 |
| | ( |
| | ( |
| | ( |
| Armstrong County | ( |
| Memorial Hospital | ( |
| | ( Date of Hearing:    September 2, 2009 |
| And | ( |
| | ( Record Closed:    September 22, 2009 |
| United Steelworkers | ( |
| Local 158-06 | ( Date of Award:    October 22, 2009 |

Representing the Company:         Joseph F. Quinn, Esq.
                                 Attorney

Representing the Union:           David R. Wolfe
                                 Staff Representative

                                 William J. Miller, Jr.
                                 Arbitrator

I.    **THE GRIEVANCE**

A class action grievance was filed on behalf of all nonprofessional employees at the Armstrong County Memorial Hospital (hereafter referred to as the "Employer") by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO-CLC (hereafter referred to as the "Union"). The grievance was filed on November 12, 2008 in accordance with the applicable provisions of the Agreement between Armstrong County Memorial Hospital and United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CIC, LU 158-06, Contract in effect from June 23, 2008 through June 22, 2011, non-professional service employees (hereafter referred to as the "Agreement") and stated the following:

The Hospital unilaterally established and implemented a "Tobacco Free Campus". The Hospital failed to negotiate the Tobacco Free Campus with the Bargaining Agent which now changed the conditions of employment for any and all employees represented by the USW.

The Union contends that this change to the long standing policy in regards to smoking/chewing which now prohibits any smoking on the Hospital's property to be unreasonable.

The former policy permitted employees to smoke/chew in designated areas outside the Hospital and in the employee's vehicles before work, after work, during the employee's lunch and breaks. The Hospital designated the areas and the Union had no objections. The designated areas were outside the Hospital and included an area known as the "BUTT HUT". Employees who smoked could go to these areas and smoke provided that it was before work, after work or during their lunch or breaks. Not all employees, patients or guests were exposed to the smoke unless they chose to enter the designated areas on their own. The employee's were also permitted to smoke in the vehicles during these above mentioned periods.

The Hospital has now stopped the use of tobacco on the Hospital property and the surrounding neighbor's property (including driving onto and off Hospital Property). Employee's violating the new policy are subject to discipline up to and including discharge.

1

The parties were in many months of negotiations and never did the Hospital propose this change.

The settlement requested was "permit employees to smoke in designated areas — areas designated for smokers prior to the unilateral change." The Employer responded to the Union's position as follows:

The letter comes as a statement of our position and a formal response to the above referenced grievance.

In early November, 2008 we informed you of our intention to go tobacco free at the Kittanning campus. We were pulling together a committee to address related personal issues, and wished to have a representative from this bargaining unit, as well as representatives from each of the other bargaining unit participate. We offered to meet with the Union and discuss the implementation of the new policy. You responded by filing the above-referenced grievance as well as an NLRB charge.

When we met on November 26, 2008, we handled it as a step three meeting as well as a negotiation session. We explained our position of being :"tobacco free" and the importance of that for a health care institution. We discussed the other health care institution that had already taken this step. You stated your position to be that you wanted something less a policy that continued to allow employees to smoke on campus. We acknowledged at that time that there was no middle ground between these positions.

We believe the Article 4 of the collective bargaining agreement gives the hospital the right to establish, revise and administer reasonable policies in the workplace. The reasonableness of the policy is demonstrated by the fact that surrounding health care facilities have moved in this direction, and we attempted to engage the Union in the development of the policy by asking your representation on the planning committee.

Moreover, even if there were an obligation to engage in negotiation over this single issue, we accomplished that when we met on November 26, both sides presented their position, and we agreed that there was no middle ground.

This is an important health care issue. We ask you to reconsider your position and recognize that smoking and tobacco use are entirely inconsistent with the mission of the hospital.

On February 12, 2009, the Union responded to the Hospital, stated the following:

I am in receipt of your letter (which was not dated, but was received February 11, 2009) in regards to Grievance Number 2008-81 Smoking Policy.

2

First let me correct some information that has been written in your response.

The Hospital did not inform me (the bargaining agent) of their intention to implement a tobacco free campus at the Hospital. The fact is that I read about the tobacco free campus in the Leader Times and telephoned you. I informed you that I believed that this is a mandatory subject of bargaining. To protect the rights of the membership in both units that I service I wrote and filed a grievance and as we discussed I was willing to negotiate a resolution to the issue. I also filed a charge with the National Labor Relations Board. As you stated on or about November 26, 2008 I agreed to meet to hear the grievance and attempt to offer what I believed was reasonable resolution to the grievance. On February 10, 2009, at approximately 4:25 p.m. when I got home, I received a certified mail notice from the United States Postal Office. On February 11, 2009, I went to the Post Office and picked up my certified mail. Your responses for Grievance 2008-81 Smoking Policy and Grievance 2008-82 Patient Access Clerks were in the envelope (which is post marked February 9, 2009). Also it must be noted that during the period of November 26, 2008 and February 9, 2009you and I had many discussion in regards to various issues. In fact we negotiated the Skilled Maintenance Agreement during this period. I have asked where the Hospital's answers to all the grievances were. If you recall I also kept requesting the follow up meeting that we were to have in November in regards to the October meeting with the Transcriptionists. Also, I kept telling you that we needed to select the panel of arbitrators as per the Labor Agreement. You kept telling me that you would talk to Joe. Please note that recently Joe and made the selections of the arbitrators and the 2 chosen arbitrator selected the 3rd panelist.

That is issue is taken care of. I point out these facts and hereby notify the Hospital that the Union reserves the right to raise a procedural issue of timeliness in any and all legal proceedings including but not limited to arbitration.

I must also address the issue that Article 4 of the Agreement gives the hospital the right to establish, revise and administer reasonable policies in the workplace. Your response is accurate to a point and not accurate to a point. The Hosp8ital has the right to establish reasonable policies and some may not have to be negotiated, but with some of these reasonable policies there must be at the very least a meet and discuss meeting prior to their implementation. Some of these reasonable policies definitely require negotiations by the parties. However, in either case the Union reserves the right to challenge the reasonableness of the policy, and under the Labor Agreements between the Hospital and the USW, these matters maybe appealed to arbitration.

Finally, I must address your statement that the parties met and agreed that there was no middle ground. The fact is that the Hospitals came in the meeting with the same position that was stated in the newspaper. There was no room to compromise on their part. The Union made a couple of suggestions. I will agree that at that meeting there was no agreement to resolve the issue. This does not remove the obligations of the parties to follow the terms of the Contract. Also, as I pointed out at the 3rd step meeting, it is now quite apparent that the Hospital deliberately did not attempt to bring this issue up during

3

negotiations with the non-professional unit because they knew that the Union had recourse other than the arbitration proceeding which would have occurred at the contract expiration.

With this in mind the Union hereby appeals this to arbitration.

The grievance was appealed to arbitration. This arbitrator was selected to hear and decide the issue. Accordingly, a hearing was held in Kittanning, Pennsylvania on September 2, 2009. During the hearing, the parties were given the opportunity to present evidence, both oral and written, to examine and cross-examine the witnesses who were sworn, and to argue their respective positions. In lieu of oral closing arguments, the parties decided to file post-hearing briefs. The briefs were received in the office of the arbitrator on September 22, 2009, at which time the record was considered closed.

## II.    STIPULATIONS

1.    This hearing and decision will cover both United Steelworker units.

2.    In 1992 the Hospital implemented a non-smoking policy in the buildings other than the psychiatry unit, but smoking was permitted in certain designated areas outside the Hospital buildings until January 1, 2009.

## III.    BACKGROUND

Darla Barnhart, Patient Access Clerk, Griever and Recording Secretary of the Union, stated previously she was a unit chair and served on the negotiating committee. She said she was involved in approximately ten to thirteen meetings concerning the present Agreement. She contended over the years she has been able to smoke on hospital property and at various locations such as in part of the cafeteria, right outside the emergency room, in the back of the hospital off to the right, in your car, back to the picnic tables, off to the side on benches and in a butt hut built by the Hospital which was

4

not noticeable from the Hospital. She testified she is not permitted to smoke at these locations, and rarely does she smoke in her car. She noted she washes her hands after she smokes, and when she is at the hospital she leaves the property, drives to a location and smokes. She indicated the smoking policy doesn't stop her from smoking. She stated she cannot recall discussions during negotiations about attendance, but there were discussions concerning other policies, rules and regulations. She mentioned she recalled discussions concerning section 4.02 of the Agreement, and a change in this language occurred, where the Union suggested the word reasonable, and the Employer agreed to such change in language. She testified there is language found in Section 4.06 of the Agreement which provides the management rights provision of the Agreement will not supercede the other specific provisions of the Agreement. She contended there is no language in the Agreement giving employees a right to smoke or no language precluding smoking, and up until January, 2009, the employees were permitted to smoke. While being cross examined she explained she was on a committee to brainstorm the tobacco free policy.

It was the testimony of Mindy Bracken that she became unit chair when Ms. Barnhart resigned such position. She said she received a copy of a draft of the tobacco free policy from Anne Remaley on October 17, 2008. She stated she received a final copy of the policy sometime during November or December, 2008, and a grievance was filed concerning this matter on November 12, 2008. She concluded her testimony by stating she does not recall any discussions during negotiations concerning a smoking policy.

5

John Lewis, President and CEO of the Hospital advised smoking had previously been banned from the building and had been permitted in certain designated areas. Mr. Lewis explained part of the problem resulted when people did not stay in the designated areas, and frequent complaints were received because of smoke coming into rooms and at the entrance location. He pointed out that smoking was absolutely against the mission statement of the Hospital and its policies. He contended the Hospital tries to maintain a healthy environment in the community as it is a health care institution, and the volunteers accosted him about the smoking policy. He stated he mentioned to the Hospital Board that he would take a look at the smoking policy with ernest, and he talked with the management team. He testified he was aware of the fact other hospitals made the move, and the hospital board endorsed the change in early August. He noted the key to altering the existing policy was to get the necessary information to employees, patients, visitors and the community of the dangers of smoking. He said a program was developed so as to communicate the new policy, and it was put in place January 1, 2009.

While being cross-examined, Mr. Lewis said a survey was conducted regarding the number of smokers and the concerns of patients, volunteers and employees. Mr. Lewis stated in preparing the smoking policy he made inquiries of other hospitals including Butler, Sharon Regional, Conemaugh, St. Margarets and Westmoreland, and it was determined some of these hospitals were going for a no smoking policy. He noted if an employee does not comply with the conditions of the policy, the employee could be discharged.

Anne Remaley, Vice President Human Resources, stated she was involved with the implementation of the policy. She said administration heard volunteers in the spring

of 2008 question why people were permitted to smoke on campus. She stated even though the hospital previously had a smoking hut and there were signs saying "no smoking", employees would still smoke by the entrance. She contended the hospital decided to take steps to become smoke free. She noted there were discussions with the board, and further informational meetings with all three Unions. She explained negotiations with the Agreement had been concluded, but the contract had not yet been voted on when the meetings were taking place. She testified it has always been her practice to deal with the Union presidents, but she had no specific experience with this policy. She advised the hospital's policy provides for no use of tobacco on any hospital owned or leased property, and if the policy is not adhered to, discipline would be issued. Ms. Remaley explained the communication which occurred related to the implementation of the policy. She noted there have been patient complaints regarding body odor, smoke and perfume. She stated during negotiations there was no discussion regarding a smoke free environment. She testified smoking was a practice prior to the implementation of the smoking ban during January, 2009.

Darla Barnhart testified further at the Armstrong County Medical Center you are permitted to smoke in a designated area.

June Posney, Health Information Specialist, stated she visited Forbes Hospital and there are certain areas where smoking is permitted.

IV.    **UNION POSITION**

Initially, the Union raises a procedural issue of timeliness. The Union asserts the parties met on November 26, 2008 and the Hospital reaffirmed to the Union it was going

to implement a "tobacco free policy," which would not permit any use of tobacco on Hospital property, including an employee's personal vehicle. The Union position was that the Union felt the use of tobacco was a long standing "past practice" and the Union believed the total elimination of tobacco while on Hospital property was not reasonable. The Union contends there was no resolution, and the meeting designated as a Step 3 meeting. The Union argues the Employer failed to follow the language set forth in the Agreement in Article 14, Section 14.01, because the Employer failed to date its third step answer. The Union asserts the Postal Service attempted to deliver the letter with the Employer's answer on February 10, 2009, and it was actually delivered on February 11, 2009. It is the Union's position because there was no written extension of the time limits, the Employer violated the procedural issue of timeliness. The Union requests that its position in this regard be sustained.

It is the position of the Union that it needs to enforce a valid past practice which has been violated by the Employer in this instance. The Union contends while the Employer says it wants a healthier hospital and community by enforcing a tobacco free policy, it also has a cafeteria that has a menu which is not totally healthy. In the Union's view that the Employer's position in this regard is inconsistent as it permits unhealthy food to be served, but does not permit smoking. While the Union understands the use of tobacco is not healthy for people, there is no founded evidence that the smell of smoke coming from a person's body is harmful to others. Also, it is contended by the Union that every anti-smoking group has reported that while the use of tobacco is harmful to a persons health, which includes second hand smoke, it has also been concluded that there

8

is no evidence that the use of tobacco in an outside area is harmful to anyone but the individual user.

It is the position of the Union that the policy of the hospital infringes on the viable long standing past practice that has been employed by the tobacco users who have been employed at the hospital for many years. With regard to the Employer argument that other policies have been unilaterally implemented by the Employer without complaint by the Union, the Union would assert that such implementation does not relinquish the Union's right for all further circumstances, including the tobacco free policy. The Union argues the surveys conducted by the Hospital regarding policies at other hospitals is not dispositive of the issue in this case because such information did not specify where and to what extent smoking was permitted. It is the position of the Union the facts are clear and unambiguous, there is no contractual language which covers this issue, and the parties followed a long standing practice which permitted employees to use tobacco while on hospital property in designated areas. It is also evident, according to the Union, that during the negotiation of the new labor agreement during 2008, the Employer's negotiating team never proposed "the tobacco free policy", and it wasn't until all negotiations were completed that the Employer brought the subject to the attention of the local unit committee and actually implemented the "tobacco free policy" January 1, 2009.

The Union contends further the allegation of the Employer that area hospitals are tobacco free is without basis, as a review of other hospitals and health centers in surrounding area shows that exceptions are made so as to provide an opportunity for employees to use tobacco on the premises. It is the position of the Union the Employer unilaterally implemented a tobacco free policy without negotiating the terms and

9

conditions with the Union, and in this situation the Employer is trying to get something in arbitration which it could not get through negotiations. It is argued by the Union the Employer's unilaterally imposed tobacco free policy is an unreasonable policy which violates not only the long standing undisputed "past practice" but also Article 4, management rights, Section 4.02, reasonable policies. The Union would also point out there is no evidence to show that the tobacco free policy is working, and that any employee quit smoking since the policy went into effect. The Union concludes the grievance must be sustained and the tobacco free policy deemed to be unreasonable. The Union contends the "past practice" of smoking in designated areas must be followed and the grievance granted in this regard.

III.    **EMPLOYER POSITION**

    The Employer believes the issue to be whether or not the policy implemented by the Employer is a reasonable policy and procedure under Section 4.02 of the Agreement. It is the position of the Employer that the timeliness issue raised by the Union related to the Employer's third step response was complicated because both a grievance and a NLRB charge were pending, and it was unclear for a number of weeks whether the case would go before the Board or to arbitration. When the Union requested a third step grievance response in late January, 2009 it was provided as both a statement of the Employer's position before the NLRB as well as the grievance response. It is the position of the Employer that neither the Agreement nor any past practice allows any procedural penalty for the Employer's delay of a grievance response. While there are due dates regarding grievance responses, the parties have not bargained for time to be of the

essence for grievance responses. Furthermore, the Employer argues there is no past practice that either side in this collective bargaining relationship has strictly construed time limits against the other with regard to grievance responses. No employee has been harmed or disciplined by the policy being in place, and the Union's request for some procedural remedy should be denied.

It is the position of the Employer that the tobacco free campus policy is a reasonable policy, properly established by the Employer. The Employer contends under Section 4.02 of the Agreement, the Employer has the right to unilaterally establish reasonable rules and regulations. The Employer contends Section 4.02 of the Agreement clearly reserves such right to the Employer, subject only to contrary provisions of the Agreement, and as the evidence has shown, there are no provisions in the Agreement which grant employees a right to smoke. It is argued further by the Employer it has unilaterally implemented a number of policies over the years related to employees. It is the position of the Employer it has long had the right to unilaterally establish reasonable policies, and there was no need to negotiate over this policy with the Union.

It is contended by the Employer that the tobacco-free campus policy meets the standard of reasonableness, and its implementation must be recognized as a legitimate management right under the Agreement. The policy clearly related to a legitimate objective of the Employer, and as being a healthcare provider, the Employer is committed to promoting a safe and healthy environment for its employees, patients, volunteers, medical staff, contract employees pre-hospital personnel, students and visitors. The Employer asserts there are legitimate goals to the policy, that is, to eliminate the unhealthy aspects of smoke in the environment for patients, to create a more healthy

11

work environment for employees, and to communicate a message of good health to the community at large. It is the position of the Employer these goals are legitimate objectives for a community based health care facility, and such policy is entirely consistent with the Employer's mission and vision. It is also the contention of the Employer it went well out of its way to make employees and the Community aware of the policy and its significance.

It is contended further by the Employer that the number of employees adversely affected by the policy was minimal, and the number of employees who will benefit from the policy is significant. The Employer would point out that when a survey was taken, the results showed that 10 percent of the workforce were smokers, and this shows a small number of employees adversely affected by the policy. In the case, the far greater number of employees, and the community at large, will benefit from a cleaner healthier workplace. Furthermore, the degree of inconvenience under the policy for those employees who want to smoke is minimal. It is also the position of the Employer that the factor as to whether the purpose of the policy is for health or safety, it is evident there is no dispute that the policy clearly protects the health and safety of employees as well as the public at large. Furthermore, the Employer argues the Union presented no evidence that the purpose of the policy should be challenged, and in fact the Union contended the Hospital is concerned about the health of the community, and admitted the Union does not question the dangers of smoking. The Agreement also provides in Section 23.01 "the Employer will make every effort to maintain its facilities and equipment in such physical condition so as to provide a safe and healthy work environment," and it is clear the policy

12

accomplishes this goal, and based upon all of the factors mentioned, the policy is a "reasonable" policy under the Agreement.

The Employer argues further that a survey of what other hospitals in Western Pennsylvania were doing showed that many hospitals were moving toward tobacco free campus policies. The Employer contends this trend is growing and the appropriate studies show that the majority of hospitals, by the end of this calendar year, will have smoke free campuses. In the Employer's view, this trend shows the reasonableness of its policy. The Employer argues the Union should not prevail in this case because it failed to carry the burden of proving any contractual violation, and the Union has offered no evidence, either testimony or documents, which supports that the policy is not reasonable. Furthermore, the Employer contends the Union presented no evidence anyone has been inconvenienced by the policy, disciplined under the policy, and no evidence that the policy does not represent a legitimate interest of the Employer. On the basis of all of the evidence and arguments made by the Employer, the policy is reasonable, and the Union's grievance is without basis and should be denied.

## VI.  RELEVANT CONTRACTUAL PROVISIONS

### ARTICLE 4
### MANAGEMENT RIGHTS

4.02

The Employer reserves the right to establish, revise and administer reasonable policies and procedures, training programs, services, and maintenance; to direct the work force; to hire., promote, evaluate, transfer, furlough, and recall employees to work; to reprimand, suspend or otherwise discipline, including discharge, employees for just cause; to determine the number of employees, their hours of work and duties to be performed by them; to establish, expand, reduce or eliminate any job, department, operation, or service provided the Employer gives 20 days advance notice to the Union; to designate positions as full-time, part-time, and casual; to establish and to post

13

schedules of work and to revise them as reasonably necessary; to determine the location of its service operations; to introduce new equipment and supplies; to control and regulate the use of facilities, supplies, equipment, and other property of the employer; to subcontract out work which has been subcontracted out before or which can be performed more economically by a subcontractor than by bargaining unit employees; to control the assignment of work, and the size and composition of the work force; to determine the qualifications of an individual to perform available work; to make or change reasonable Employer rules, regulations, policies and practices, provided the Employer gives advance notice to the Union; to determine or change the starting and quitting time and the number of hours worked; to determine the work shifts; to establish or change standards, to establish or change wages in accordance with the provisions of Article 11, Section 11.08 and otherwise to help the Employer attain and maintain full operating efficiency and effectiveness of the Hospital to ensure that the parties promote the highest quality patient care and treatment possible.

## ARTICLE 14
### GRIEVANCE AND ARBITRATION

14.01

A grievance is a controversy concerning the interpretation or application of a specific provision of this Agreement. The Hospital and the Union will do their best to see that baseless and dilatory grievances do not arise. The procedures outlined in this Article shall be the exclusive procedure for resolving all grievances arising out of this Agreement. The Unit chairperson or grievance officer must be present at all grievance meetings/hearings. In order for a grievance to be recognized, it must be brought to the attention of the Employer and must be processed through the following steps:

A.    Step 1 – The aggrieved employee and/or the Union's grievance representative shall present the grievance orally to the grievant's immediate supervisor in an attempt to informally resolve the matter. To be considered timely, a grievance must be presented to the employee's immediate supervisor within five business days of the date the employee or Union knew or should have known of the events giving rise to the grievance. The Employer agrees to hold the Step 1 meeting within five business days of the date the grievance is presented to the grievant's immediate supervisor. The Employer's representative conducting the Step 1 meeting shall respond in writing within five business days of the date of the Step 1 meeting. Any resolution of grievances at this level shall not be precedent setting. It is a requirement of Step 1 of the procedure for the grievant to be present at the Step 1 meeting. Absent mitigating circumstances, if the grievant is not made available to the Step 1 meeting within five business days, the grievance will be dismissed on a non-precedent setting basis.

14

B.    Step 2 – if the grievance is not settled at Step 1, the grievance shall be reduced to writing and received by the department head of his/her designee within five business days after receipt of the Step 1 answer. Every written grievance shall set forth in detail the acts or occurrences giving rise to the alleged violation of the Agreement, including applicable times, dates, provisions violated, individuals involved, etc. The submission of a written grievance within such time limits and with such detail shall be considered a condition precedent to arbitration, unless otherwise agreed to in writing. After submission of the written grievance, the department head or designee will meet with the Union's designated representative within five business days of submission of the grievance to the department head or designee in an attempt to resolve the grievance. The Employer agrees to answer the grievance in writing within seven business days of the meeting.

C.    Step 3 – if the grievance is not resolved at Step 2, the Union may, within ten business days of receipt of a Step 2 answer, submit the written grievance to the President of the Hospital or his/her designee. A meeting will be held by the President or his/her designee with a designated International Representative, the Unit chairperson, the Unit/Department Griever, or the grievant (if requested by the International Representative) to discuss the merits of the grievance and to ascertain the facts. Within 15 business days following the hearing, the Employer will provide a written response to the grievance.

D.    Step 4 – if the grievance is not settled at Step 3, a representative of the International Union or his/her designee may submit the grievance to arbitration within 15 business days of the receipt of the Employer's Step 3 answer by filing a request for arbitration in accordance with the arbitration procedure described below. The submission of a request to arbitrate within this time frame shall be considered a condition precedent to arbitration unless otherwise agreed to in writing. Upon receipt of the request to arbitrate, an arbitrator will be selected in accordance with the procedure described below. If the grievance is not submitted to arbitration within the required 15 business day period, it shall be deemed settled on the basis of the Step 3 answer.

Business day means Monday through Friday, excluding Saturday, Sunday and Holidays as defined in Article 20.

14.02

All facts, evidence and issues then known to the Union, Employee and Employer shall be raised at the lower steps of the grievance procedure in the interest of resolving the grievance and shall not be knowingly withheld by the Union, employee, or Employer. During the above steps of the grievance procedure, the Employer shall provide relevant information to the Union upon request as required by law.

**14.03**

The time limits of this Article may be extended by the mutual written agreement of the parties.

**14.04**

The parties agree that for the term of this Agreement there shall be a permanent panel of Arbitrators to resolve any dispute placed before them. The Union shall select one Arbitrator to sit on the permanent panel. The Employer shall select one arbitrator to sit on the permanent panel. The third Arbitrator shall be selected by those two named Arbitrators. Once selected, these three Arbitrators shall hear the arbitration grievances on a rotational basis. The three Arbitrators shall be placed in a permanent order. Such order shall be made by the parties selecting the names out of a hat. Either party may eliminate only one Arbitrator during the term of this Agreement, in which case the side originally selecting that Arbitrator shall once again select another arbitrator. All named Arbitrators must be members of the National Academy of Arbitrators and must be from the Western Pennsylvania area.

The selected arbitrator shall hear the grievance promptly and shall issue a written award within 30 days after the close of the hearing or the filing of oral summation or post-hearing briefs. The award of the arbitrator shall be final and binding upon both parties to this Agreement. The arbitrator shall have no power to add to, subtract from, or modify any provision of this Agreement. Any back pay awarded by the arbitrator shall be reduced by amounts received by the employee working elsewhere or through self-employment, including all unemployment insurance ben3efits received by the employee. Only one grievance shall be decided at the same hearing, except by mutual written consent of the parties. The cost of the arbitrator shall be borne equally by both parties.

The Unit chairperson or his/her designee shall be allowed time off his/her job, without pay, not to exceed four hours per week which may be extended by mutual agreement, to investigate grievances he/she is to discuss with the Employer. The department head/supervisor will grant written permission for the Unit Chairperson or designee to leave his/her work place for this purpose provided such leave does not affect the orderly operation of the Hospital or adversely affect patient care. Such requests shall not be unreasonably denied.

## VII.    OPINION

There are two issues to be decided. The first issue is whether or not the Employer violated Article 14, Section 14.01, C of the Agreement by not responding to the Union's grievance within 15 days. The second issue to be decided is whether or not the Employer

violated Article 4, Section 4.02 of the Agreement when it implemented a tobacco free policy in January, 2009. A review of the relevant record has established the following material facts. As stipulated, in 1992 the Hospital implemented a non-smoking policy in the buildings other than the psychiatry unit, but smoking was permitted in certain designated areas outside the hospital buildings. In 2007, the Employer revised its mission statement, and it began a series of meetings with employees and volunteers in late 2007 and early 2008, to discuss the new statement. During these meetings, the Employer's CEO and Vice President of Human Resources were confronted on a number of occasions about the inconsistency of the Employer having a mission statement which promoted healthy behavior, while it knowingly permitted, and provided accommodations for employees to smoke at the hospital. After many discussions, surveys and appropriate research, the Employer decided to implement a tobacco free policy. There was discussion with the Union, who had filed a grievance concerning the policy, and on November 26, 2008, the Employer and Union met at the third step to discuss the new policy. No resolution occurred, and because of the pendency of the grievance and an NLRB charge, the Employer mailed its 3rd step response to the Union on February 9, 2008. The evidence shows the Employer implemented the policy on January 1, 2009.

With respect to the procedural issue of timeliness raised by the Union, upon carefully reviewing the established facts, it is clear that the parties discussed the policy on November 26, 2008, and it is unrefuted the parties considered the November 26 meeting as a third step hearing. This being the case, pursuant to the language found in Article 14, 14.01 C, the Employer would need to provide a written response to the grievance within 15 business days following the hearing. In this case, the Employer pointed out a response

17

was not provided within 15 days because in this case both a grievance and an NLRB charge were pending, and from the Employer's perspective, it was not clear for a number of weeks whether the case would go before the board or to arbitration. In my considered opinion, the evidence establishes that there were concurrent actions taken by the Union in the grievance procedure and with a charge filed with the NLRB. However, this fact, in and of itself does not relieve the Employer of its contractual obligation to provide answers to grievances in accordance with its contractually mandated obligation. In this case it would have been more appropriate for the Employer to respond to the grievance in a timely manner in accordance with the applicable provision of the Agreement as specified in Article 14, 14.01 C, rather than delay the response because an NLRB charge had been filed by the Union. Notwithstanding the failure of the Employer to respond to the grievance as required by the Agreement, there is no penalty provision because of the Employer's failure to respond. There is no provision in the Agreement which requires any sanction against the Employer, because of its failure to respond in a timely manner. In this case, the Union took the remedy that was available to it, which was to appeal the grievance to arbitration. As the record reflects, the Union appealed the grievance to arbitration, and in doing so was not deprived of its procedural rights to have its case heard in arbitration. The Union is not entitled to any further remedy in this regard.

The next question to be decided is whether or not the Employer violated Article 4, Section 4.02 of the Agreement when it implemented a tobacco free policy during January, 2009. Article 4, Section 4.02 provides "the Employer reserves the right to establish, revise and administer reasonable policies and procedures." Undoubtedly, the Employer has the right to unilaterally establish policies which are reasonable. This right

of the Employer is provided by the specific provision of Article 4, Section 4.02 of the Agreement, and gives the Employer the right to establish policies in the ordinary course of its business, which are intended to further its mission. In doing so, however, it is necessary for the Employer to adhere to the applicable provisions of the Agreement. As is clearly stated in Section 4.02 of Article 4, the policies established by the Employer must be reasonable.

In this case, the Employer has argued its tobacco free policy meets the test of reasonableness because it meets a legitimate objective of a health care provider by promoting a safe and healthy environment, the policy does not adversely affect a large number of employees, the degree of inconvenience to employees who want to smoke is minimal, and the policy is within the norm of acute care facilities who are implementing similar policies. It is the position of the Union that the policy implemented by the Employer is unreasonable, because it deprived the employees who smoke an opportunity to continue smoking as they have in the past. I have carefully considered the evidence presented, the arguments put forth by the parties and the applicable Agreement language. Upon reviewing the tobacco free policy, it becomes readily apparent the Employer has established a policy which it believes promotes the health and safety of its employees, as well as all other individuals who are associated with the Hospital premises. It cannot be argued that a tobacco free policy does not help to limit smoking in a specific area. While such a policy will certainly make it more difficult for an individual to smoke, the establishment of a policy, in and of itself, does not guarantee that individuals will actually stop smoking. I also recognize the Employer has attempted to stop employees smoking by assisting with patches and sessions to help employees break their smoking habit. I

19

certainly don't want to minimize the intent of the overall tobacco free policy, and its attempt to improve the health of all concerned. These objectives of the policy are appropriate, and show that the Employer is trying to meet its overall mission. While the approach of the Employer is commendable, the specific issue in this case centers on the reasonableness of the policy. In this case, the evidence shows there has been a no smoking policy in effect since 1992, but all during this time there has been an opportunity for employees to smoke in certain designated areas outside the hospital buildings. In my considered opinion, what has occurred in this circumstance was the establishment of a past practice regarding employees having a designated location to smoke. The employees had come to expect they would have a specific location to smoke, and in my considered opinion, this expectation rose to the level of a protected local working condition. The Employer was well aware of this practice, as it had been in place for many years, but it never took steps to alter this working condition. It is quite clear from the evidence which has been established that the Employer never attempted to negotiate a change to the existing practice in its recent negotiations with the Union, but chose to continue with the existing arrangements that existed for employees to smoke in designated areas. It was only subsequent to the conclusion of its negotiations that the Employer decided to alter the existing smoking arrangements, and in doing so changed the established local working condition.

The Employer has contended its policy is reasonable, and it can be unilaterally implemented, as other policies have been implemented in the past. I understand the contentions of the Employer in this regard, and recognize that certain policies can in fact be unilaterally implemented. Also, I am not saying that the policy of the Employer has

no basis and is to be disregarded. It is my opinion the unilateral implementation of a policy can occur, but where such policy alters the existing rights of the employees, that such rights need to be considered in the development of the policy. It should also be understood that the Employer's tobacco free policy is not completely unacceptable, as many of the provisions of such policy are well meaning and provide a positive message. The problem with the policy is that it fails to make a reasonable accommodation for employees who previously had a designated location to smoke. It is also readily apparent that the Employer has previously had problems policing the designated smoking areas, but this should not deter the Employer from established a controlled designed smoking area for its employees, so as to properly provide for the established working condition enjoyed by the employees pursuant to the prior smoking policy. Making such alteration to the existing policy would satisfy the past practice which previously existed, while providing for a reasonable tobacco free policy.

## AWARD

The Employer failed to provide its grievance answer in accordance with the time limits established by the Agreement, but there is no remedy provided for in the applicable language, and the Union's appeal of the grievance to arbitration was not prohibited. The policy is unreasonable because it fails to make reasonable accommodation for employees to smoke in a designated area. The Employer is directed to meet with appropriate Union representatives for the purpose of providing for a reasonable accommodation for employees to smoke in a designated area. Should the parties be unable to agree upon an appropriate area, I will retain jurisdiction for the purpose of assisting the parties in arriving at such arrangement.

William J. Miller, Jr.
Arbitrator
October 22, 2009

21